**Michael JOHNSON, et al., Plaintiffs–Appellants,**

v.

**NATIONAL SEA PRODUCTS, LTD., et al., Defendants–Appellees.**

No. 94–1105.

United States Court of Appeals, First Circuit.

Heard Aug. 1, 1994.

Decided Sept. 20, 1994.

627

Joseph G. Abromovitz, with whom Marsha A. Morello, George F. Leahy and Abromovitz & Leahy, P.C., Boston, MA, were on brief for appellants.

Brian P. Voke, with whom Richard P. Campbell, Kathleen M. Guilfoyle, Campbell & Associates, P.C., Boston, MA, David T. DeCelles, and Avery, Dooley, Post & Avery, Belmont, MA, were on brief for appellees.

Before TORRUELLA, SELYA and CYR, Circuit Judges.

TORRUELLA, Circuit Judge.

Appellants Michael and Kelli Johnson ("plaintiffs") filed an action alleging negligence and breach of warranty against defendant National Sea Products, Ltd., in connec-

tion with injuries that Michael Johnson ("Johnson") suffered when a pallet of frozen fish fell upon him. At trial, the jury found in favor of the defendant on the negligence claim. The court directed a verdict for the defendant on plaintiffs' breach of warranty claim. Plaintiffs ask this court to grant them a new trial due to errors allegedly committed by the district court. Plaintiffs also ask this court to reverse the district court's order directing a verdict on the breach of warranty claims. We affirm the district court in all respects.

## I.

## BACKGROUND

On May 19, 1989, Michael Johnson was injured when a pallet loaded with boxes of frozen cod fillets ("the fish") fell on him while he was working as a stock-loader at Condyne, Inc., a public warehouse in Avon, Massachusetts, which stored frozen foods.

National Sea is a Canadian corporation engaged in the business of harvesting, processing and distributing fish. Among their many products are Hi-liner cod fillets which are frozen, packed in sealed plastic containers, placed in boxes, and then packed into "master cartons" for shipment. Before being shipped, National Sea piles the master cartons on several 40″ × 48″ wooden pallets and applies a plastic stretch wrap to hold the cartons together and to keep them from falling off the pallet.

National Sea consists of two corporations: National Sea Products, Ltd., a Canadian company, and National Sea Products, Inc., a United States company. The Canadian corporation is the parent company, and the United States corporation is a wholly owned subsidiary. These corporations are, in turn, divided into several operating units, among which is Canada Products–Corporate Sales ("Canada Products"), a division of the Canadian corporation, with responsibility for servicing major accounts.

One of Canada Products' major accounts was Long John Silver, also known as Jerrico, Inc., which was expected to be the purchaser of the fish involved in this case. The fish was processed and packaged according to specifications provided by Long John Silver and the cartons were placed on the pallets for shipment according to Long John Silver's specifications for pallet configuration, which required that each layer have eight cartons and that there be five layers on the pallet. Sometimes, for storage at its Lunenburg, Nova Scotia plant, National Sea uses a different pallet configuration for these cartons, placing them ten cartons to a layer, three layers high.

Although the fish involved in this case were prepared, packaged and placed on pallets to Long John Silver's specifications, in anticipation of a possible order, there was, at the time of Johnson's accident, no order by Long John Silver for these fish.

The fish in question were shipped from the Canadian corporation to Canada Products care-of the Condyne public warehouse. Generally, when the shipment arrives at Condyne, a bill for storage is generated and sent to the American corporation, which enters the shipment in its records and is responsible ultimately for paying the storage bill. The ownership of the goods does not pass, however, until the end of the month when there is an intercompany financial reconciliation of all transferred products. Ultimately, Long John Silver purchased the fish in question. The fish, however, were not purchased or shipped to Long John Silver until the following month, long after the accident.

When the shipment of fish arrived at Condyne, the Condyne receiver ordered the truck driver, an employee of Carleton County Brokerage, Ltd.,[1] to remove the top layer from each of the pallets, reducing them to four layers of eight cartons each, and to make up new pallet loads with the removed boxes. Apparently this was done so that the pallet loads would fit into Condyne's rack storage system. After the truck driver had

---

**1.** Plaintiffs' original suit included Harold B. Legge Transport, Ltd. as trucking agent for National Sea. Subsequent discovery revealed that Legge had contracted with Carleton County Brokerage Ltd. to ship the subject load. Hence, Carleton was added as a direct defendant. During the course of trial, plaintiffs and Carleton settled.

reconfigured the boxes on the pallets, the shipment was 22 pallet loads instead of the original 17.

Rather than placing the fish in the rack storage facilities, however, Johnson, using a forklift, bulk stacked or free stacked the fish by piling one pallet load on top of another, four pallet loads high with a fifth pallet load spanning the gap between each stack of four. Each pallet load was four feet high, and weighed over one ton. Johnson was piling these heavy loads 16 to 20 feet high.

Johnson testified that the accident occurred as he stacked the pallet loads four and five loads high. He testified that as he attempted to move the two highest pallet loads in the stack, the top pallet fell. Johnson jumped from the truck and ran, but was hit by the pallet load. There is no evidence as to whether the pallet which fell had been configured by National Sea or by Carleton's driver.

In his suit, Johnson alleged that National Sea, as seller of the fish, packaged the fish in an unstable palletized configuration rather than National Sea's own recommended 3 × 10 configuration. The method of stacking by National Sea created a condition referred to by the witnesses as "pyramiding" when the pallets of fish were bulk stacked, *i.e.,* one pallet stacked atop another, four or five pallets high.

The trial in the district court commenced on November 29, 1993. Much of the trial concerned whether National Sea should have foreseen that the pallet loads of fish would be bulk stacked four or five loads high rather than stored in racks. It was undisputed that the pallet configuration of the cartons of fish was entirely safe for rack storage and that Johnson would not have been injured if the pallet loads had been placed in racks at Condyne.

Following the close of the evidence, the district court judge granted National Sea's motion for a directed verdict on plaintiffs' breach of warranty counts because it found that the goods had not reached an ultimate consumer and therefore, no warranties attached. On December 16, Rule 49(b) interrogatories were submitted to the jury.

The jury answered the following interrogatory in the negative, thereby precluding further response to the subsequent interrogatories and disposing of the case in favor of National Sea:

> Was it reasonably foreseeable by the Defendant, National Sea Products, Ltd. that the pallet loads in question would be stacked at Condyne Freezers by a forklift truck one on top of another to a level of four/five pallet loads high?

On appeal, the plaintiffs contend that: 1) the district court erred in granting National Sea's motion for a directed verdict as to the plaintiffs' breach of warranty claims; 2) statements made by defense counsel during closing argument were improper and resulted in reversible error; and 3) the court erred in instructing the jury on the issue of foreseeability and defective design.

## II.

## DISCUSSION

### A. *Breach of Warranty Claims*

The plaintiffs claim that Michael Johnson was entitled to benefit from warranties of merchantability and that the district court erred in dismissing their breach of warranty claims. Under Massachusetts law, "a warranty of merchantability is implied in two situations: (1) when title to goods passes for a price, and (2) when a contract is made for the future passing of title to goods for a price." *Mason v. General Motors Corporation,* 397 Mass. 183, 187–88, 490 N.E.2d 437, 440 (1986).

Plaintiffs have not presented any evidence showing that there was a sale of goods, or any contract for sale, particularly one involving themselves. Therefore, we need not determine whether Johnson was a member of the class of persons entitled to benefit from any warranties of merchantability that might attach to a sale of the fish.

There was no evidence of a sale of goods between National Sea and Long John Silver. Rather, the evidence indicates that at the time of the accident, Long John Silver had not yet placed an order for these fish, and that the fish might have been sold to anyone.

There was no contract for sale between National Sea and Long John Silver: no price had been determined, no delivery date had been set, and no quantity or other terms had been specified.

Nor was there a sale or contract for sale from the National Sea parent to the United States subsidiary. The fish were owned, at the time of the accident, by Canada Products, a division of the Canadian corporation. The fish could have been sold at the end of the month to the United States corporation at a price to be determined at that time, but that was not a certainty. Instead, the fish might have been disposed of or returned to Canada prior to any transfer. Under these circumstances, absent any sale of the fish or contract for the sale of the fish, no warranty of merchantability could have attached.

■ A directed verdict is appropriate where the evidence is such that a reasonable person could be led to only one conclusion, namely, that the moving party is entitled to judgment as a matter of law. *Luson Int'l Distributors, Inc. v. Fabricating & Production Machinery, Inc.*, 966 F.2d 9, 10–11 (1st Cir.1992). Therefore, the district court did not err in directing a verdict on this issue.

### B. *Defense Counsel's Closing Argument*

■ As grounds for a new trial, the plaintiffs charge that National Sea's counsel, Mr. Richard Campbell, engaged in improper arguments in two respects. First, the plaintiffs argue that Mr. Campbell referred to supposedly excluded evidence, that this reference prejudicially influenced the jury, and as such, constituted reversible error. In his closing argument, counsel argued that National Sea did not learn that their product was being bulk stacked on top of another, four or five high, until representatives of National Sea, Morgan Palmer and Walter Waldrop, went to Avon after the accident in August, 1989. Mr. Campbell told the jury:

> So National Sea Products never was told that this stuff was being bulk stacked one pallet on top of another. Never. National Sea Products didn't learn that these pallets were being bulk stacked one on top of another, four or five high, until Morgan

Palmer and Walter Waldrop went down to Avon in August, 1989. August, 1989.

Plaintiffs' counsel immediately objected to this reference, contending that such testimonial evidence had been excluded by the court. Following plaintiffs' objections to this statement, Mr. Campbell made efforts to remind the judge that evidence of these facts was not entirely excluded. Despite these efforts, the court gave the following "curative" instruction:

> [T]he Court's recollection is clear that the evidence was excluded. But I'll tell the jury: You might have a different recollection. You may have heard that statement in the course of the testimony of the witness, in which event you may consider it. If, on the other hand—it's my recollection and that of the plaintiff's counsel that the Court excluded it for the basic reason because it happened subsequent to the accident. That was the basis of the Court's ruling. And I do believe it was excluded.

Plaintiffs contend that the trial judge's curative statements were not sufficient to erase the prejudicial effect of defense counsel's reference to the excluded testimony. We need not determine whether the curative instructions were satisfactory because our review of the record reveals that this evidence was not excluded by the court and therefore, the defense counsel's argument was not inappropriate.

During Morgan Palmer's testimony, the following exchange took place:

Q. Sir, in May, prior to May 19, 1989, what was your understanding with regard to how National Sea Products Limited's product was being stored at the Avon facility of Condyne?

A. It was being put into racks.

Q. *Did there come a time, sir, when you learned that the product was not being stored in racks?*

A. In August—

MR. LEAHY: *Objection.*

THE COURT: Excuse me. *The objection is overruled* in the sense that you can answer the question, "Yes, there came a time," and then there will be a question.

Q. Let me try again. Did there come a time, sir, when you learned that National Sea Products Limited's products were not being stored in racks at the Avon facility of Condyne?

A. *Yes.*

Q. When was that?

A. *That was in August of 1989.*

MR. LEAHY: *Objection.*

THE COURT: Excuse me?

MR. LEAHY: Objection. I noted an objection. He said August of 1989, and that's post accident, your Honor.

THE COURT: He answered the question and *the answer may stand.*

Q. Can you tell the jury, sir, what the circumstances were by which you learned that the product was being stored outside of a rack at the Avon facility in August of 1989?

MR. LEAHY: Objection.

THE COURT: Objection sustained.

Q. Did you personally visit the Avon plant in August of 1989?

A. Yes.

(emphasis added).

Thus, while the court excluded certain observations as post-accident, it clearly admitted testimony indicating that National Sea first learned its products were not being stored in Condyne's racks in August of 1989 and that Morgan Palmer went to Condyne's plant in August of 1989. Its rulings in this regard have not been challenged on appeal. Because this case concerned only two types of storage: storage in racks or bulk stacking, it was reasonable to infer from the evidence admitted that if the products were not being stored in racks, they were being bulk stacked.

■ The trial judge had broad discretion to deal with supposed improprieties in closing arguments, and absent an abuse of discretion, we will defer to his or her actions in this regard. *González–Marín v. Equitable Life Assurance Soc.*, 845 F.2d 1140, 1147–48 (1st Cir.1988). Far from abusing his discretion, the trial judge in this case gave an unnecessary curative instruction, which if anything, could have caused harm to the defendants, not the plaintiffs.

■ The plaintiffs point to another allegedly improper aspect of Campbell's closing argument, which they raised for the first time in their post-trial motion for a new trial. The plaintiffs claim that Mr. Campbell displayed to the jury a Condyne brochure which was not in evidence to show that Condyne promoted its rack storage facilities. A review of the transcript of Mr. Campbell's closing argument, however, does not reveal any objection on behalf of plaintiffs to this alleged brochure-waiving. Since a timely objection was not made, the issue was not preserved for appeal. *See Doty v. Sewall*, 908 F.2d 1053, 1056 (1st Cir.1990). Our review is therefore limited to plain error. *Id.*

Our review of the record does not reveal any statement indicating that a Condyne brochure of promotional materials was displayed before the jury. Mr. Campbell also submitted an affidavit in response to the plaintiffs' motion for a new trial, that denies that any brochure was shown to the jury during his closing argument. Because there is absolutely no evidence in the record that the alleged brochure waiving actually occurred, nor any objection on behalf of the plaintiffs, we find that plaintiffs' claim has no merit.

### C. *Jury Instructions on Foreseeability*

■ The plaintiffs complain that the court erred by refusing to charge the jury with their requested instruction in Request Number 55. Request Number 55 stated:

a manufacturer has a duty to anticipate the environment in which it's [sic] product will be used and to design against the reasonably foreseeable risk attending the products used in that setting.

The plaintiffs contend that the product in question included not only the frozen fillets of fish packed within each box but also the method by which National Sea stacked the boxes of frozen fish one atop another and then stretch-wrapped each pallet for shipment. Plaintiffs argue that it was foreseeable to National Sea that the product would be bulk stacked at Condyne. They maintain that National Sea, therefore, had a duty to

anticipate that the product would be bulk stacked at Condyne and to design their product in a manner that took into account the alleged reasonably foreseeable risks of bulk stacking. Plaintiffs contend that whether National Sea fulfilled its duties in this respect was an issue that should have been submitted to the jury and that no other part of the court's charge addressed this particular claim.

"An error in jury instructions will warrant reversal of a judgment only if the error is determined to have been prejudicial, based on a review of the record as a whole." *Davet v. Maccarone*, 973 F.2d 22, 26 (1st Cir.1992). We examine the jury instructions to determine "whether they adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues." *Id.* at 26 (internal quotation and citation omitted).

We do not find reversible error in the court's charge to the jury. In the present case, the alleged defect was the manner in which cartons of fish were stacked on the pallet. The plaintiff bears the burden to show that his use of the product was a foreseeable one, regardless of whether or not it was the intended use of the product, and "[w]here there is no foreseeable use, there is no liability." *Allen v. Chance Mfg. Co.*, 398 Mass. 32, 34, 494 N.E.2d 1324, 1326 (1986).

The court charged the jury on the subject of National Sea's obligation to consider the reasonably foreseeable circumstances and foreseeable dangers involved in the packaging and palletizing of its product, and to guard against foreseeable harm as follows:

"Ordinary care" is not an absolute term but a relative one; that is to say, in deciding whether ordinary care was exercised in a given case, the conduct in question must be viewed in the light of all the surrounding circumstances as shown by the evidence in this case. The amount of care exercised by a reasonably prudent person will vary in proportion to the danger known to be involved in what is being done, and it follows that the amount of caution required in the use of ordinary care will vary with the nature of what's being done and all the surrounding circum-

stances shown by the evidence in the case. To put it another way: As the danger that should reasonably be foreseen increases, so the amount of care required by the law increase[s].

Bringing those principles closer to the facts of this case, *the defendant was not required to package and palletize its cartons in a way that made them accident proof or even to package or palletize them in the safest possible way, but, rather, to package and palletize them in a manner that is reasonable under the circumstances. Its duty was, rather, one of reasonable care to protect against foreseeable harm.*

(emphasis added).

This instruction was accurate and no further instructions were required by law. Because the instructions "show no tendency to confuse or mislead the jury with respect to the applicable principles of law," they are satisfactory and must be upheld. *Harrington v. United States*, 504 F.2d 1306, 1317 (1st Cir.1974).

*Affirmed.*