Scott P. HAMMOND, Plaintiff,
Appellee, Cross–Appellant,

v.

T.J. LITLE & COMPANY, INC.,
Defendant, Appellant,
Cross–Appellee.

Nos. 95–1690, 95–1913.

United States Court of Appeals,
First Circuit.

Heard Dec. 6, 1995.

Decided April 30, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied May 24, 1996.

Anthony M. Feeherry, with whom Paula M. Bagger and Goodwin, Procter & Hoar, Boston, MA, were on brief, for appellant.

Michael J. Liston with whom Glass, Seigle & Liston, Boston, MA, was on brief, for appellee.

Before CYR, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

BOWNES, Senior Circuit Judge.

This appeal arises out of a dispute over the compensation terms of an employment contract. Appellee/Cross–Appellant Scott P. Hammond ("Hammond") filed suit after he was discharged by Appellant/Cross–Appellee T.J. Litle & Company, Inc. ("the Company"), alleging that the Company had breached certain terms of his employment contract entitling him to shares of stock in the Company, and the implied covenant of good faith and fair dealing. After a bifurcated trial in which certain issues were decided by the jury and others by the magistrate judge, the Company appeals and Hammond cross-appeals. Finding no error, we affirm.

## I. BACKGROUND

In the spring of 1986, Thomas J. Litle ("Litle") was starting up the Company and Hammond was about to graduate from the Harvard Business School. On May 4, 1986, Litle orally offered Hammond the position of Vice President of Finance and Administration, with a compensation package including a current annual cash salary of $45,000, the right to purchase a maximum of 100 shares of non-voting founders' stock in the Company at a subscription price of $1.00 per share, and deferred compensation of $10,000 per year to be converted to additional shares of stock at Hammond's option. Hammond accepted the package with the understanding that there would be further negotiation regarding both a vesting schedule for the 100 shares and the repurchase rights the Company would have with respect to vested shares upon termination of his employment.

Hammond began employment with the Company on June 9, 1986. In July of 1986, the Company's outside counsel sent Hammond, at his request, a draft Stock Restriction Agreement and a draft Repurchase Agreement. Hammond then met with Litle to discuss the draft agreements and requested a more favorable vesting schedule for his 100 shares than that reflected in the draft

Repurchase Agreement. Litle agreed, approving the change with a handwritten note. According to the vesting schedule thus agreed upon, 16% of the shares would vest on March 31, 1987, 2% would vest each month from April 1, 1987 through February 28, 1990, and 14% would vest on March 31, 1990. Litle and Hammond agreed that the draft agreements were acceptable in all other respects. In August of 1986, outside counsel prepared and sent Hammond execution copies of the agreements. The Repurchase Agreement incorporated the new vesting schedule, and the Stock Restriction Agreement provided that a stockholder whose employment was terminated "for cause" was required to tender his vested shares to the Company for repurchase at fair market value.

In September of 1986, Hammond and Litle met for the purpose of executing the agreements, but Hammond unexpectedly requested a number of substantive changes. Based on his belief that the parties had completed negotiations, Litle rejected Hammond's proposed changes and the agreements were not signed.

In a letter to Hammond dated March 31, 1987, Litle took the position that agreement had not yet been reached regarding Hammond's stock participation. Hammond became upset and refused to report for work until the issue was settled. At a meeting on April 14, 1987, Litle told Hammond that he could acquire a maximum of 66⅔ shares of stock, that 25% of the shares would vest on each anniversary of Hammond's employment date of June 9, 1986, and that before half of the shares (33⅓) would begin to vest according to that schedule, Hammond would have to meet certain as yet undefined performance standards. Hammond became angry and refused to accept the changes. In a letter to Hammond dated April 17, 1987, Litle memorialized the same terms, chastised Hammond for his recent behavior, warned him that a recurrence would be deemed a tender of resignation that would probably be accepted, but encouraged him to attempt to redeem himself. The new terms also were confirmed in a letter from General Manager Bruce Alemian ("Alemian") to Hammond dated July

13, 1987. The evidence was in dispute regarding whether Hammond ever accepted the new terms. The Company contended that he did by reporting to work and tendering a check for $66.67. Hammond contended that he continued to insist on 100 shares, and tendered $100 but paid $66.67 because that was all Litle would accept.

At a meeting in December of 1987, Hammond again complained that he believed he was entitled to acquire 100 shares. In an effort to settle matters, Alemian gave Hammond a positive performance review and offered him the 33⅓ performance shares if he would relinquish his claim to a full 100 shares. Hammond refused and Litle withdrew the offer of the performance shares. On January 27, 1988, Hammond was terminated.

## II. PRIOR PROCEEDINGS

In a Second Amended Complaint, Hammond alleged that the Company had breached that part of his employment contract entitling him to acquire shares of stock in the Company by breaching the implied covenant of good faith and fair dealing, terminating his employment because he refused to accept Litle's unilateral alteration of his contract rights, refusing to issue him the 100 shares due him under the agreement, and refusing to issue him additional shares for deferred compensation.

By agreement of the parties, the trial was bifurcated into a jury phase and a jury-waived phase. Phase I was tried to a jury in June, 1994. The issues for the jury were: (1) whether Hammond and the Company had entered into a contract entitling Hammond to acquire company stock; and (2) if so, how many shares Hammond was entitled to receive upon termination of his employment. Through answers to special questions submitted by the court, the jury found that the parties had entered into a contract and that Hammond was entitled to 48 shares.

Phase II was tried to the court in December, 1994, in order to resolve two remaining issues: (1) whether Hammond had an obligation to offer the 48 shares back to the Company for repurchase; and (2) whether

the Company had an obligation to issue 5 additional shares to Hammond in lieu of deferred compensation. On June 7, 1995, the magistrate judge issued a memorandum of decision, answering both questions in the negative.

## III. DISCUSSION

The Company appeals the jury's determination that Hammond was entitled to 48 shares, and the magistrate judge's determination that Hammond had no obligation to offer the shares back for repurchase. Hammond cross-appeals, challenging the magistrate judge's conclusion that the Company need not issue him shares in lieu of deferred compensation.

### A. *The Jury's Determination That Hammond Was Entitled To 48 Shares*

The jury, answering special questions submitted by the court, found that Hammond and the Company had entered into an agreement in May of 1986 entitling Hammond to 100 shares of the Company's stock upon his acceptance of the Company's offer of employment; that this contract was last amended in the summer of 1986; and that Hammond was entitled to 48 shares of stock as of the date his employment was terminated.[1]

■ The Company concedes that there was evidentiary support for the jury's determination that a contract for 100 shares was formed in May of 1986 and was last modified by the vesting schedule agreed upon in the

summer of 1986, but contends that there was no evidence to support the jury's finding that Hammond was entitled to 48 shares.

The court had instructed the jury that if it found (as it did) that a contract for 100 shares was formed in May of 1986 and that it was last amended in the summer of 1986, then it should determine the number of shares to which Hammond was entitled according to one of three alternatives: *First*, the jury could award Hammond at least 36 shares, which represented the number of shares that had vested between June of 1986 and January 31, 1988, according to the vesting schedule reflected in the execution copy of the Repurchase Agreement prepared in August of 1986.[2] *Second*, the jury could award Hammond 100 shares if it found that the contract contained an implied term that Hammond would have a fair opportunity to earn all 100 shares and that the Company had breached that term by firing him without cause.[3] If the jury found that there was such an implied term, but that there was cause for terminating Hammond, then he would be entitled to only 36 shares.[4] *Third*, the jury could award Hammond some number of shares greater than 36 if it found that he was an at-will employee who could be terminated with or without cause; that the Company terminated him "without cause or in bad faith for the purpose of preventing him from getting his shares;" and that "some additional amount of shares was intended to compensate Mr. Hammond not for further services to be performed after January 31, 1988, but for having accepted employ-

1. Hammond had argued that the contract was never modified after May of 1986 so that he was entitled to all 100 shares. The Company had argued that no contract was ever formed, but that if there was a contract, it was last amended in April of 1987 as reflected in Alemian's letter of July 13, 1987. The jury rejected these alternatives.

2. According to that vesting schedule, 16 shares vested as of March 31, 1987, and 2 additional shares vested for each of the next 10 months through Hammond's termination on January 31, 1988, for a total of 36 shares.

3. This instruction was based on *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 583 N.E.2d 806 (1991), in which the Supreme Judicial Court stated that "the implied covenant of

good faith and fair dealing provides 'that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* 583 N.E.2d at 820 (citations omitted).

4. The court defined "cause," consistent with the definition set forth in *Goldhor v. Hampshire College*, 25 Mass.App.Ct. 716, 521 N.E.2d 1381, 1385 (1988), as meaning that "there is a reasonable basis for the employer to be dissatisfied with the employee's performance, entertained in good faith, for reasons such as lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior, or grounds for discharge reasonably related, in the employer's honest judgment, to the needs of the business ... [w]hether or not you agree with the employer's judgment."

ment with the Company back in May or June of 1986 [and] foregoing other possible employment opportunities." [5]

The Company contends that the jury must have based its verdict on the third alternative under the instructions since it awarded Hammond neither 36 nor 100 shares, but that there was no evidence that any number of shares was intended to compensate Hammond for accepting employment with the Company and foregoing other opportunities. The Company did not object to the instruction that invited the verdict of 48 shares, and explicitly does not quarrel with that instruction on appeal. It concedes that it forfeited its right to a new trial by not moving for one in the district court pursuant to Fed.R.Civ.P. 59(a), but asks that we remand to the district court with instructions to enter judgment for 36 shares. As Hammond correctly points out, however, the Company also forfeited its right to a judgment for other than 48 shares by failing to raise the issue in a motion for judgment as a matter of law. Fed.R.Civ.P. 50(a), (b).

█ It is beyond peradventure that in order to challenge the sufficiency of the evidence on appeal, a party must first have presented the claim to the district court, either by moving for judgment as a matter of law before the case is submitted to the jury and renewing that motion after the verdict, Fed.R.Civ.P. 50(a), (b), or by moving for a new trial pursuant to Fed.R.Civ.P. 59. *See Scarfo v. Cabletron Sys., Inc.,* 54 F.3d 931, 948 (1st Cir.1995); *Velazquez v. Figueroa–Gomez,* 996 F.2d 425, 426–27 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 553, 126 L.Ed.2d 454 (1993); *La Amiga del Pueblo, Inc. v. Robles,* 937 F.2d 689, 691 (1st Cir.

1991); *Pinkham v. Burgess,* 933 F.2d 1066, 1070 (1st Cir.1991); *Jusino v. Zayas,* 875 F.2d 986, 991–92 (1st Cir.1989); *Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors,* 850 F.2d 803, 810 (1st Cir.), *cert. denied,* 488 U.S. 955, 109 S.Ct. 392, 102 L.Ed.2d 381 (1988). Otherwise, we have no decision of the district court to review, and will not review the weight of the evidence for the first time on appeal. *La Amiga,* 937 F.2d at 691; *Wells,* 850 F.2d at 810. The Supreme Court has stated that an appellate court is "without power to direct the District Court to enter judgment contrary to" the verdict absent a Rule 50 motion in the district court. *Cone v. West Virginia Pulp & Paper Co.,* 330 U.S. 212, 218, 67 S.Ct. 752, 756, 91 L.Ed. 849 (1947).

Here, the Company did not bring the asserted error to the district court's attention in any way. After Hammond's case but before the close of all the evidence, the magistrate judge informed counsel that he intended to instruct the jury that it could award Hammond any shares it found were intended as consideration for his accepting the Company's offer if it also found that the Company acted in bad faith or without cause in discharging Hammond. The Company argued at that point that there was no evidence to support such an instruction but never renewed the argument by objecting to the instruction after it was given, or by moving for judgment as a matter of law or for a new trial on that basis.[6] At the close of all the evidence, the Company moved for judgment as a matter of law, but argued only that there was insufficient evidence that a contract to purchase 100 shares of stock was ever formed, or that if a contract was

---

5. This instruction was based on Massachusetts case law applying the implied covenant of good faith and fair dealing to allow recovery of compensation already earned where an employer terminates an at-will employee in bad faith for the purpose of depriving him of compensation already earned, *e.g., Cataldo v. Zuckerman,* 20 Mass.App.Ct. 731, 482 N.E.2d 849 (1985); *Fortune v. Nat'l Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977), or without cause and not in bad faith but with the effect of depriving the employee of compensation already earned, *Gram v. Liberty Mut. Ins. Co.,* 391 Mass. 333, 461 N.E.2d 796 (1984); *Gram v. Liberty Mut. Ins. Co.,* 384 Mass. 659, 429 N.E.2d 21 (1981).

6. We do not mean to imply that a failure to object to an instruction bars our review of a claim of insufficiency of the evidence *if* the appellant has moved in the district court for judgment as a matter of law or for a new trial. *See Boyle v. United Technologies Corp.,* 487 U.S. 500, 513–14, 108 S.Ct. 2510, 2519–20, 101 L.Ed.2d 442 (1988); *St. Louis v. Praprotnik,* 485 U.S. 112, 120, 108 S.Ct. 915, 922, 99 L.Ed.2d 107 (1988) (plurality opinion of O'Connor, J., joined by Rehnquist, White and Scalia, JJ.).

formed, it was the one for 66⅔ shares memorialized in Alemian's letter to Hammond dated July 13, 1987.

We do not think that this motion reasonably can be read as encompassing the argument that no reasonable jury could return a verdict including any shares intended as consideration for Hammond's accepting the Company's offer. *See Wells,* 850 F.2d at 810 (motion for judgment as a matter of law must "be made with sufficient specificity to allow the district judge to understand precisely why the evidence is insufficient" and "[a]ppellate review may be obtained only on the specific ground stated in the motion"). Even if it could be so read, it would not help the Company because it did not renew the motion after the verdict. *See* Fed.R.Civ.P. 50(b); *Velazquez,* 996 F.2d at 426–27.

The Company complains that it could not have moved for judgment as a matter of law on the grounds asserted here because the standard requires that the evidence be "such that a reasonable person could be led to only one conclusion, namely that the moving party is entitled to judgment as a matter of law." *Johnson v. Nat'l Sea Prods., Ltd.,* 35 F.3d 626, 630 (1st Cir.1994). The Company asserts that its argument that the jury could not as a matter of law conclude that Hammond was entitled to 48 shares was not amenable to that standard because the jury could have reached several conclusions—that Hammond was entitled to 8.34, 16, 36, 66.67 or 100 shares.

The Company misreads our statement in the *Johnson* case. A party may move for judgment as a matter of law on an issue by issue basis; it does not have to be all or nothing. *See* Fed.R.Civ.P. 50(a)(1). The Company knew before the case went to the jury, when it first should have made the argument it now presses, that the magistrate judge's instruction would allow the jury to find that some number of shares was intended as consideration for Hammond's acceptance of the Company's offer. The Company could have argued then and after the verdict, as it has here, that the evidence was legally insufficient to support such a finding.[7] By failing to do so, it forfeited the claim.

▌ We therefore review only for plain error resulting in a manifest miscarriage of justice, *see Simon v. Navon,* 71 F.3d 9, 13 (1st Cir.1995), and find that there was none. "It is fundamental to our system of jurisprudence that, when the evidence as a whole can plausibly support more than one view of a situation, '[j]urors, using common sense and collective experience assess credibility and probability, and proceed to make evaluative judgments, case by case.' " *La Amiga,* 937 F.2d at 691 (citations omitted). Though we see no evidence of an explicit agreement that 12 shares were intended as consideration for Hammond's accepting the Company's offer of employment, there was evidence that before accepting the offer, Hammond discussed with Litle how much compensation he would need to forego his other offers, and that his almost exclusive concern regarding compensation was shares of stock, not cash salary. Alternatively, the jury may simply have found that a contract was formed and last amended in the summer of 1986, but that neither the minimum of 36 shares nor the maximum of 100 shares was appropriate. We doubt that such an outcome constitutes error at all in this particular case, and it clearly does not amount to a manifest miscarriage of justice. We therefore will not disturb the verdict, particularly because the Company failed to preserve the argument for appeal. *See Braunstein v. Massachusetts Bank & Trust Co.,* 443 F.2d 1281, 1285 (1st Cir.1971).

**B.** *The Magistrate Judge's Determination That Hammond Had No Obligation To Offer The Shares Back For Repurchase*

▌ After Phase II of the trial, the magistrate judge found, based on the evidence and the jury's finding that the parties had reached agreement regarding vesting during the summer of 1986, that the parties had reached agreement at the same time on all essential terms regarding stock restrictions and repurchase rights, that those terms were

---

7. The Company also could have moved for a new trial or a remittitur under Fed.R.Civ.P. 59 on that basis. *See* 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* §§ 2805, 2815 (1995).

reflected in the execution copies of the Repurchase and Stock Restriction Agreements prepared by the Company's outside counsel in August of 1986, and that the parties deemed execution of the final versions of the written agreements to be a mere formality and not a condition to the effectiveness of their agreements. The Stock Restriction Agreement provided in relevant part that:

> [i]n the event the Corporation terminates the employment of the Stockholder for cause, the Stockholder shall within five (5) days after such termination offer in writing all of the Shares then owned by him ... to the Corporation for purchase at [fair market value].

The magistrate judge concluded that Hammond had no duty to offer his shares back to the Company for repurchase because although the Company had offered evidence showing "at most, that [it] had grounds to terminate Hammond for cause," it had "not ... in fact opted to do so." [8]

Alemian, who made the decision to terminate Hammond, testified that he decided to fire Hammond in part because he had not completed the monthly financial statements for September through December of 1987, but primarily because of his inability to overcome his negative feelings about the stock situation. Alemian testified that Hammond's own motivation and ability to motivate others had suffered in April of 1987 when Litle first proposed the reduced stock package, but that he was able to function properly after Litle warned him. In December of 1987, Alemian began to observe the same frustration in Hammond. He explained the basis of his decision to discharge Hammond on January 27, 1988, as follows:

I felt that he was never going to be able to get beyond his frustration and disagreement with the contractual change, and that that ultimately was impacting on his ability to perform in the company at the level that one would expect from a CFO and one of three or four top management people in the organization. Much of that performance would not only relate to specific duties, but also projections to the rest of the organization and setting ... a positive tone in the company. I just didn't feel that he could get beyond that, and that, in fact, the company's well-being would be jeopardized at that point if I allowed the situation to go forward.

Alemian further testified that other than the performance problems stemming from the dispute over the shares of stock, Hammond's performance had been fully adequate, and that if he did not believe that Hammond was of value to the Company, he would not have attempted to settle the matter on prior occasions. [9]

Alemian and Hammond both testified about what Hammond was told when he was terminated on January 27, 1988. Alemian testified that after he told Hammond that his employment was terminated as of that date, Hammond asked if it was because of his performance, and Alemian replied that "it was not." Rather, he "told him that the relationship issues between he [sic] and the chairman of the company Tim Litle had reached a point in my mind where the conflict between the two was in the way of the continued development of the company." Alemian testified that he "did not say to him that he was being terminated for cause," and that Litle had not instructed him to tell Hammond that he was being terminated for cause.

8. The magistrate judge correctly ruled that the Statute of Frauds, U.C.C. § 8–319, did not bar enforcement of the repurchase provision of the Stock Restriction Agreement against Hammond. Hammond stated in his pleadings that an oral contract was formed in May of 1986 for the purchase of 100 shares of stock and testified that he understood the contract to be subject to further negotiation regarding vesting and stock restriction issues; the repurchase provision therefore was an integral part of a contract Hammond admits was made and that he sought to enforce. See Mass.Gen.L. ch. 106, § 8–319(d). The Company does not contend that the Statute of Frauds would prevent enforcement of any part of the contract against it.

9. The Company also presented the testimony of three of its employees describing deficiencies in Hammond's management and accounting methods, but these witnesses were lower level employees who took no part in the decision to fire Hammond, and most of what they described was not observed by or communicated to Hammond's superiors.

Hammond testified that after Alemian said that he was terminated, he said, "I presume this has nothing to do with my performance, it's because I'm not agreeing to the stock cut," and Alemian responded, "Yeah, that's correct, it's not your performance, it's the fact that you have this dispute with the chairman of the company and it can't continue and you've got to go. We can't get rid of the chairman of the company."

Based on the foregoing evidence of the circumstances surrounding Hammond's termination, the magistrate judge stated:

> [W]hether or not the Company had grounds to terminate Hammond for cause, and whether or not its decision to terminate Hammond, although not communicated to him at the time of termination, was the result of its disappointment with his performance, the Company deliberately chose not to attempt to exercise its right to terminate Hammond for cause. Instead, no doubt with the hope of avoiding an immediate confrontation, it elected to exercise its alternative right to terminate him without cause.

In addition to the fact that Alemian specifically told Hammond that he was not being terminated because of his performance, the magistrate judge relied on a letter the Company sent to Hammond on February 19, 1988. The letter confirmed events regarding his termination but gave "no hint that Hammond was terminated for cause." Although Hammond had not tendered his vested shares to the Company, the Company did not demand that he do so in the letter or otherwise. The letter stated that the Company was exercising its "right" to purchase Hammond's unvested shares and enclosed a check for those shares, but said only that it was "prepared" to discuss repurchasing his vested shares and invited Hammond to contact the Company "if" he wished to discuss such repurchase. The magistrate judge found that the "precatory language" regarding the vested shares in a letter sent 19 days after the effective date of Hammond's termination could "not be squared with the Company's present contention that Hammond had a duty to offer his shares to the Company within *five* days of his termination." Finally,

the magistrate judge relied on the fact that the Company's by-laws permitted the Board of Directors to remove an officer "with or without cause," but if removed for "cause," the officer was to be given notice and opportunity to be heard by the Board of Directors, and Hammond was not given notice or an opportunity to be heard.

■ The Company appeals the magistrate judge's ruling that Hammond was not terminated for cause, claiming two alternative errors of law. The Company argues that under Massachusetts law it is the objective existence of cause, and not the reason the employer communicates to the employee upon termination, that controls the determination of whether the employee was discharged for cause. Alternatively, the Company contends that if what the employer tells the employee does control, then the magistrate judge applied an overly narrow definition of "cause" by relying only on Alemian's denial that he was terminating Hammond for inadequate performance, and ignoring that Alemian also told Hammond that he was being terminated because of his "relationship issues" with Litle. Hammond responds that the magistrate judge's determination that the Company chose not to terminate him for cause was a finding of fact with ample record support. Though the magistrate judge's conclusion was a finding of fact, the issues the Company raises question whether, in so finding, the magistrate judge considered the wrong factors or misdefined "cause" as a matter of Massachusetts law. We address these claimed errors of law *de novo. Juno SRL v. S/V Endeavour,* 58 F.3d 1, 4 (1st Cir.1995).

The Company principally relies on *Klein v. President and Fellows of Harvard College,* 25 Mass.App.Ct. 204, 517 N.E.2d 167 (1987), for its contention that it is the objective existence of cause, and not what the employer tells the employee upon termination, that controls the determination of whether the employee was discharged for cause. In *Klein,* the trial court found that the dean had terminated the plaintiff as if she were an at-will employee who could be discharged for any reason within a three-month probationary period, but that she had an employment

agreement for a definite period of time and therefore could be terminated only for cause. *Id.* 517 N.E.2d at 169. According to the trial court, her termination as a probationary employee therefore was a breach of her employment contract. The Supreme Judicial Court reversed, ruling that the plaintiff's dismissal was for cause. The plaintiff, who was an administrative director at Harvard's school of public health, had strained and acrimonious relationships with faculty members and had been evaluated by them as being unhelpful, difficult to work with and a poor administrator. *Id.* at 168. The dean terminated Klein because of her poor performance and a particularly disparaging memorandum she had written about one faculty member. *Id.* Although the dean did not recite those reasons in his formal letter of termination (stating only that "regretfully, we have to terminate your services"), he did discuss them with Klein in a meeting four days before he issued the letter. The court stated:

> *The important point* is that the plaintiff, notwithstanding the letter of dismissal, *knew why her employment was terminated....* Any notions the plaintiff might have entertained that she was doing her work diligently and competently and that her conduct was appropriate were reasonably dispelled on March 24th, when *the dean met with her and discussed her job performance and "ill-considered" memorandum to the executive committee.*

*Id.* at 170 (emphasis added).

Thus, *Klein* stands for the proposition that, when an employee may only be terminated for cause, whether the employer so informs the employee plays a decisive role in a court's later determination of whether the employee was discharged for cause (unless, of course, the stated reason was a pretext). We think that the same principle applies where, as here, an employee may be terminated without cause, but other rights and duties under the employment contract depend on whether the employee is terminated for cause. The interpretation of Massachusetts law sought by the Company would allow an employer to enter into an employment contract spelling out rights and duties that hinge on whether the employee is terminated for cause, then tell the employee that he is not being terminated for cause, then seek the benefits of a termination for cause by articulating cause as its reason in any ensuing litigation. As *Klein* indicates, that is not the law.

The Company urges that *Cort v. Bristol-Myers Co.,* 385 Mass. 300, 431 N.E.2d 908 (1982), also supports the proposition that its stated reason for terminating Hammond is irrelevant. In *Cort,* the plaintiffs, who were at-will employees, were fired after they refused to answer part of a company questionnaire which they regarded as invading their privacy. Although the plaintiffs' performance records were good, they were notified that they were being discharged for poor performance. *Id.* 431 N.E.2d at 909. The plaintiffs then sued, claiming that they were terminated in bad faith because the employer gave a pretextual reason for discharging them, and that the real reason—their refusal to complete the questionnaire—was contrary to public policy. *Id.* at 911. The Supreme Judicial Court held that "an at-will employee discharged without cause does not have a claim for damages simply because the employer gave him a false reason for his discharge," *id.,* and that firing the plaintiffs for their incomplete answers to the questionnaire violated no principle of public policy. *Id.* at 912. The court explained, however, that the fact that an employer gave a false reason would be relevant if by giving it the employer was attempting to conceal its real reason for discharge and the real reason violated public policy. *Id.* at 911 n. 6. Thus, according to *Cort,* an employer's stated reason is irrelevant where no consequences flow from either the real reason or the stated false reason. But where, as here, consequences flow from whether the termination was for cause, the employer's stated reason is determinative, assuming it is not pretextual.

The Company contends that *King v. Driscoll,* 418 Mass. 576, 638 N.E.2d 488 (1994), also supports its position. In *King,* the employer's real and stated reason for terminating King was that he participated in a shareholder derivative suit against the company. *Id.* 638 N.E.2d at 491. The Supreme Judicial

Court reversed the trial court's ruling that this reason violated public policy. *Id.* at 492–93. It upheld the trial court's conclusion that the employer had not violated its by-laws by not providing King notice and a hearing as required in a termination for cause, because King was terminated without cause. *Id.* at 495. The court rejected King's contention that the legitimate business reasons the employer proffered at trial showed that he was terminated for cause, finding that the employer likely would not have advanced those reasons but for King's claim that he was terminated in violation of public policy. *Id.*

*King* hardly supports the Company where it articulated Hammond's poor performance as the reason for his discharge, not when it let him go, but after he filed suit 10 months later. True, Litle discussed performance issues with Hammond in September of 1986, April of 1987, and October of 1987, but those problems centered primarily around the stock dispute and there was ample evidence that Alemian and Litle nonetheless valued Hammond as an employee and that his performance improved after he was warned. When Hammond was terminated in January of 1988, Alemian affirmatively stated that his performance was not the reason. As the magistrate judge stated, "there was no evidence that, when the boom was actually lowered, the Company advised Hammond that he was in fact being terminated for cause." Assuming the Company could have terminated Hammond for cause, it chose not to act on that basis, and cannot erase the choice it made by articulating different reasons in the course of litigation.

That brings us to the Company's alternative argument—that if the employer's stated reason does control, the magistrate judge defined "cause" too narrowly by relying only on Alemian's denial that performance was the basis for his termination, and ignoring that he also told Hammond that the reason was his "relationship issues" with Litle, which the Company contends also constitutes "cause" under Massachusetts law. "Cause" for termination includes:

(1) a reasonable basis for employer dissatisfaction with a[n] ... employee, entertained in good faith, for reasons such as lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior, or (2) grounds for discharge reasonably related, in the employer's honest judgment, to the needs of his business. Discharge for "just cause" is to be contrasted with discharge on unreasonable grounds or arbitrarily, capriciously, or in bad faith.

*Goldhor v. Hampshire College,* 25 Mass.App. Ct. 716, 521 N.E.2d 1381, 1385 (1988) (citations omitted).

We think that the magistrate judge well understood that this definition embraces reasons other than performance, and so instructed the jury. *See* note 4, *supra.* Rather than misperceiving the meaning of cause, the magistrate judge obviously found that the only basis for cause supported by the evidence was inadequate performance, stemming from the stock dispute or otherwise, but that the Company specifically eschewed that as its reason. According to Alemian's and Hammond's testimony, Hammond was terminated, at best, because he had "relationship issues" with Litle, or at worst, because he refused to accept the reduced stock package. The latter reason could well be viewed as a termination in bad faith for the purpose of depriving Hammond of shares to which he was entitled, which, of course, does not constitute just cause. And according to our reading of Massachusetts law, a "relationship issue" is not, without more, cause for termination.

The Company cites *Klein* and *Goldhor* in support of its contention that when an employee holds a managerial or supervisory position, a "relationship issue" or "personality conflict" may properly be considered cause for termination. The Company mischaracterizes *Klein* as so holding because the employee in that case was terminated for poor performance. In *Goldhor,* the director of a research center at Hampshire College had an intense difference of opinion with a tenured professor about how funds were to be raised for the center. *Goldhor,* 521 N.E.2d at 1383. This led to a public power struggle, with each demanding that the other leave the center, and the president of the college deciding that the director would have to leave since the

professor was tenured. *Id.* at 1383–84. The Massachusetts Appeals Court held that the trial court improperly directed a verdict for the college because it did not follow termination procedures contained in the employee manual. *Id.* at 1382. The court indicated that if the issue of "just cause" was reached on retrial, the plaintiff's conflict with the professor would be an appropriate consideration, but did not indicate that it would be controlling. *Id.* at 1385. Moreover, in contrast to *Goldhor,* Hammond's disagreement with Litle was not over how any aspect of the business was run, but concerned the terms of his employment contract. As already noted, Hammond's resistance to what he believed to be a breach of his employment contract could not be considered "just cause" for his termination. That aside, the conflict in this case had not risen to the level, as in *Goldhor,* where Litle and Hammond could not continue to work together. As Litle testified, he had no intention of terminating Hammond and did not call for his termination, but simply accepted Alemian's recommendation that he be terminated. Finally, we note (though the magistrate judge did not mention it) that the jury's finding that Hammond was entitled to 48 shares necessarily included a finding that the Company terminated Hammond either without cause or in bad faith for the purpose of preventing him from getting his shares.

In sum, we think the magistrate judge correctly found that the only reason the Company may have had to terminate Hammond that amounted to just cause under Massachusetts law was Hammond's performance, that it chose not to terminate him for that reason and told him so, and that he therefore had no obligation to sell his shares back to the Company.

C. *The Magistrate Judge's Determination That The Company Had No Obligation To Issue Hammond Shares In Lieu Of Deferred Compensation*

█ In their joint pretrial memorandum, the parties stipulated that Hammond had a contractual right to convert, at his option, his accrued deferred compensation into stock, and that if he properly exercised his option, he was entitled to 5 shares. The issue for Phase II of the trial was whether Hammond properly exercised his option by filing his lawsuit 10 months after his employment was terminated. The magistrate judge ruled that Hammond had not exercised his option within a reasonable time by filing his lawsuit 10 months after his discharge, that even then the prayers for relief in Hammond's complaint did not constitute an attempt to exercise his option, and that he had failed to carry his burden of proving that it would have been futile to attempt to exercise his option at or nearer the time he was terminated.

█ Hammond first claims that the magistrate judge erred as a matter of law in construing the contract as requiring him to exercise his option during his employment or within a reasonable time of his termination. He claims that the time frame for the exercise of his option was as long as his compensation remained deferred. Because there was no explicit agreement between the parties as to when Hammond was required to exercise his conversion right, the magistrate judge was called upon to decide whether Hammond exercised it within a "reasonable time." *See Bushkin Assocs., Inc. v. Raytheon Co.,* 815 F.2d 142, 146 (1st Cir.1987) ("when a contract is silent as to time, the term shall be a reasonable time based on all the relevant evidence."). The magistrate judge's determination that he did not was a finding of fact subject to the clearly erroneous standard of Fed.R.Civ.P. 52(a). *See, e.g., Crellin Technologies, Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 9 (1st Cir.1994) (what amount of time is reasonable in a particular case is a "classic example" of a decision that the law leaves to the district court); *Flagship Cruises, Ltd. v. New England Merchants Nat'l Bank of Boston,* 569 F.2d 699, 702 (1st Cir.1978) ("The reasonableness of a period of time except as to extremes would seem to be a classic issue for the trier of fact."); *Cataldo,* 482 N.E.2d at 857 n. 20 (question whether buyback option was exercised within a reasonable time "was peculiarly appropriate for decision by the factfinder"). Hammond argues that in making that factual determination, the magistrate judge impliedly interpreted the contract to require

him to exercise his option within a reasonable time of his employment rather than at any time while the compensation remained deferred. This, Hammond argues, was a question of law, *Fashion House, Inc. v. K mart Corp.*, 892 F.2d 1076, 1083 (1st Cir.1989), subject to *de novo* review.

■ Recognizing that the magistrate judge's determination that Hammond did not act within a reasonable period was a finding of fact that contained a ruling of law, we find that the magistrate judge erred neither as a matter of law nor as a matter of fact because the ruling was well-supported by the "nature of the contract, the probable intention of the parties as indicated by it, and the attendant circumstances." *Charles River Park, Inc. v. Boston Redevelopment Auth.*, 28 Mass.App. Ct. 795, 557 N.E.2d 20, 32 (1990). Hammond's right to convert his deferred compensation into stock, as memorialized in various documents (most of which Hammond himself drafted), was described as the "employee's" option or choice. Hammond urges that when he was terminated, he was in the position of a nonemployee investor holding convertible debt keyed to the period during which the debt remained outstanding. This is so, he argues, because the Company's position was that he would not receive his deferred compensation until the Company achieved a better cash flow situation. Although that may have been the Company's position with regard to paying *cash* for deferred compensation, nothing in the record indicates that Hammond's option to convert deferred compensation into stock was similarly contingent. Even more to the point, nothing in the record indicates that the Company intended that a former employee could turn a simple deferred employee compensation arrangement into a right to purchase stock at a very low price at some time in the indefinite future when the stock became far more valuable. As the magistrate judge found, the stock valuation rate at the time Hammond was terminated was such that the shares he would have received were worth far less than the deferred compensation of $16,000 to

which he was entitled.[10] The testimony at trial demonstrated that other employees regarded as laughable the notion that anyone would elect to accept stock in lieu of cash in March of 1988 when the Company began paying deferred compensation. The magistrate judge correctly keyed the reasonable period of time to Hammond's employment.

■ Hammond also claims that the magistrate judge's failure to find as a matter of fact that the Company had repudiated his contractual right to convert his deferred compensation into stock, thus relieving him of any duty to exercise his option, was clearly erroneous. Repudiation by one party relieves the other party from further performance, but such repudiation "'must be a definite and unequivocal manifestation of intention [not to render performance].'" *Thermo Electron Corp. v. Schiavone Constr. Co.*, 958 F.2d 1158, 1164 (1st Cir.1992) (quoting 4 Arthur L. Corbin, *Corbin on Contracts* § 973, at 905–06 (1951)); *see also* Restatement (Second) of Contracts § 250 cmt. b (1981).

The magistrate judge did not err in failing to find that the Company repudiated the contract. When Alemian terminated Hammond on January 27, 1988, he offered Hammond deferred compensation at a minimum rate of $2,000 per month to be paid in cash as soon as the Company had sufficient funds, but Hammond did not say at that point that he elected to exercise his option to receive the deferred compensation in the form of stock. Alemian followed up with a letter dated February 19, 1988, in which he stated that the Company was "prepared to discuss ... payment of deferred compensation," and asked Hammond to contact him if he wished to discuss it. Hammond did not respond. Hammond complains that Alemian did not mention his right to convert deferred compensation to stock at his exit interview or in the letter, but that does not mean that the Company repudiated its duty to honor that right. It was Hammond's option to exercise,

10. Hammond could convert his deferred compensation into stock at a "price equal to the stock's fair market value at the time the deferred compensation was earned," but the price would be "no less than the latest price paid by investors." The latest price paid by investors in early 1988 was $3,000 per share, which apparently was more than it actually was worth at the time.

and Hammond made no effort to do so until 10 months after he was terminated.

Because the magistrate judge did not err in finding that 10 months from Hammond's termination was not a "reasonable time," we need not decide whether he correctly found in the alternative that the prayer for relief in Hammond's complaint did not constitute an exercise of his option, or whether the Company later repudiated Hammond's right to convert deferred compensation into stock in the course of this litigation.

■ One matter remains. Shortly before oral argument, Hammond moved this Court for leave to file a motion in the district court pursuant to Fed.R.Civ.P. 60(a) to correct a purported omission in the judgment, to wit, that the magistrate judge ordered only that the Company was not required to issue shares in lieu of deferred compensation but failed to order the Company to pay Hammond his deferred compensation in cash. The motion was denied without prejudice to reconsideration by the panel hearing the merits. We deny the motion because Hammond did not seek the relief of being paid his deferred compensation in cash. This is because whether the Company owed it in cash was not at issue. As the magistrate judge found, the Company admitted that it owed Hammond the deferred compensation, and the Company has stated that it stands ready to pay Hammond $16,468.30 in cash as soon as this appeal is decided.

For all of the foregoing reasons, the judgment is *affirmed.* The parties shall bear their own costs of appeal.